IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| ERINMEDIA, LLC, and REACTV, LLC, | ) |
| Plaintiffs, | ) |
| v. | ) CIVIL ACTION NO. __________ |
| NIELSEN MEDIA RESEARCH, INC. | ) |
| Defendant. | ) |

**PLAINTIFFS' COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

NOW COME Plaintiffs erinMedia, LLC ("erinMedia") and ReacTV, LLC ("ReacTV") (collectively "Plaintiffs") and bring this action for treble damages, attorney's fees, costs of suit, and injunctive relief against Nielsen Media Research, Inc. ("Defendant" or "NMR") under federal and state antitrust laws. Plaintiffs show the Court and allege as follows:

## INTRODUCTION

1. Television plays an enormously influential role in American society through its impact on commerce and culture. Television ratings are an integral part of the television industry. These ratings, which attempt to measure

audience viewership on a national and local level, provide a standard currency for doing business in the television industry. Ratings are used by television programmers to decide what to broadcast and when and are used by advertisers and their agents to help determine where to place their commercials and how much to pay to do so.

2. Unfortunately, this key currency in the television industry is controlled by a monopolist -- NMR, which earns hundreds of millions of dollars annually in this business. NMR has held this monopoly for many years and has used various anticompetitive means over time to maintain its lucrative monopoly. Indeed, in 1963, the Federal Trade Commission ("FTC") concluded that NMR (or its predecessor company) was acting to maintain its monopoly by unreasonably impeding competition by actual and potential competitors and ordered that NMR cease its monopolistic practices.

3. Despite the FTC's efforts, NMR continues to engage in unlawful acts to maintain its monopoly in the market for the provision of national television audience measurement data. NMR has unlawfully preserved its monopoly in this relevant market through various predatory practices designed to impede or prevent competitive entry by companies like erinMedia, which could erode NMR's monopoly and provide lower prices, expanded output, and

increased product innovation. Among other things, NMR has acted to preserve its monopoly by strategically acquiring potential competitors (or otherwise eliminating their competition through business arrangements) and by securing multi-year, staggered contracts with some or all of the four largest broadcast companies -- ABC, CBS, Fox, and NBC -- which makes it effectively impossible for any competitor to establish a competing television audience measurement tool for the relevant market or any segment therein. Thus, NMR's conduct has allowed it to impose a "one size fits all" solution for the national television audience measurement data market, precluding competition to determine the best audience measurement tools for over-the-air broadcasts, analog or digital cable transmissions, digital satellite transmissions, or any other method of delivering television content.

4. NMR's predatory conduct and its continued monopoly has directly harmed Plaintiffs and has caused substantial consumer harm. Through its predatory conduct, NMR has been able to charge monopoly prices for its products and has been able to impede or prevent innovation in the relevant market. NMR's conduct has allowed its faulty and vastly under-inclusive audience sampling methodology to influence the misspending of billions of dollars in advertising and other commercial activities in the television industry

each year. NMR's monopoly prevents innovative new television networks, like ReacTV, from acquiring the accurate and precise ratings they need to launch new network channels. NMR's unlawfully maintained monopoly also adversely impacts competition in local television audience measurement data markets and in other markets that support the relevant market (such as data collection and measurement data analysis). Simply put, NMR's unlawfully maintained monopoly causes substantial consumer harm and must be stopped so that full and fair competition may be allowed to determine the products and prices that will be made available to consumers.

5. Accordingly, pursuant to federal and Florida antitrust laws, Plaintiffs seek damages to compensate them for injuries caused by NMR's unlawful conduct and equitable relief to prevent NMR's continued predatory practices so that prices and innovation in the relevant market can be set by competition.

**PARTIES TO THE ACTION**

6. Plaintiff erinMedia, LLC is a limited liability company incorporated in the State of Florida, organized and existing under the laws of the State of Florida, and conducting business in Pinellas County (St. Petersburg) and Manatee County (Brandenton), Florida.

7. Plaintiff ReacTV, LLC is a limited liability company incorporated in the State of Delaware, organized and existing under the laws of the State of Delaware, and conducting business in Pinellas County (St. Petersburg), Florida.

8. Defendant Nielsen Media Research, Inc. ("NMR") is a for-profit corporation organized and existing under the laws of the State of Delaware and conducting business in Pinellas County (Oldsmar), Florida. NMR's United States corporate headquarters is located in the State of New York.

**JURISDICTION AND VENUE**

9. This Complaint is filed and these proceedings are instituted under Section 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, to obtain injunctive relief and to recover treble damages and the costs of suit, including reasonable attorney's fees, against NMR for the injuries sustained by erinMedia and ReacTV by reason of NMR's violations of Section 2 of the Sherman Act, 15

U.S.C. § 2, and Section 542.19 of the Florida Antitrust Act, FLA STAT § 542.19.

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

11. This Court has personal jurisdiction over NMR because it transacts substantial business in the State of Florida and maintains offices and significant operational facilities in the State of Florida.

12. Venue is proper in this jurisdiction pursuant to 15 U.S.C. § 22 because NMR is found in, is an inhabitant of, and transacts business in this district. Venue is also proper in this district under 28 U.S.C. § 1391 because a substantial portion of the affected interstate trade and commerce described herein was carried out in this judicial district.

## RELEVANT MARKET

13. The relevant market for the purpose of the antitrust claims stated herein is the market for the provision of national television audience measurement data in the United States (the "Relevant Market").

## INTERSTATE COMMERCE INVOLVED

14. erinMedia and NMR are competitors and engage in business in the Relevant Market as defined above. ReacTV is a potential customer of both erinMedia and NMR in the Relevant Market.

15. erinMedia and NMR provide services and information for sale across state lines, and NMR has annual sales in excess of $500 million.

16. NMR's actions alleged herein have restrained competition and trade in the Relevant Market and have directly and adversely restricted erinMedia's entry into the Relevant Market, erinMedia's sales in interstate commerce, and ReacTV's ability to obtain the detailed television audience measurement data necessary for its business.

## FACTUAL BACKGROUND

### *NMR's Inaccurate and Misleading Sampling Methodology*

17. As described above, NMR is a television data collection and research company engaged in the production and sale of market research and audience research analyses, ratings, and reports in the United States and Canada.

18. There are approximately 109 million television-viewing households in the United States. NMR collects both local and national

television audience measurement data and performs analyses and prepares reports based on this data, which NMR then sells to the four national broadcast networks, locally owned television stations, cable networks, multi-system operators ("MSOs"), satellite television service providers, and advertising and marketing agencies. This information is used to determine what programming will be made available on television and to determine the cost to advertise on television.

19. Upon information and belief, NMR collects its television audience measurement data using three methods that, in all three cases, involve sampling a tiny subset of television viewers and that ultimately generate inaccurate reports as to television viewership: (1) With respect to viewership information on the national level, NMR collects data from a small sample group of "national" households, numbering approximately 5,000, who have agreed to allow NMR to install metering devices, known as Nielsen People Meters, that interface with the television sets in the sample households to collect data on the programming being run. The Nielsen People Meters measure what program or channel is being tuned and who, within the sample household, is watching. Household members can indicate that they are watching a particular program at a given time by pressing personal viewing buttons on a remote control device

linked to the Nielsen People Meter. The data received from the 5,000 sample households is currently supplemented by the same information gleaned from approximately 2,800 sample households in seven of the top ten local markets; (2) On the local level, there are 210 sample markets which, upon information and belief, each contain approximately 400 sample households on average. Outside of the top ten markets (which generally follow the national market methodology), NMR uses two alternative methods to collect information in the local markets: (a) In approximately forty-six of the 210 local markets, NMR utilizes a combination of tuner meter technology and paper diary recordation; and (b) in the remaining approximately 154 local markets, NMR uses a straight diary recordation method. NMR exclusively controls all aspects of this ratings process: selecting the sample household, collecting the sample results, and analyzing and selling the sample data.

20. NMR's use of a tiny number of sample households and its use of outmoded research collection methodologies leads to the production of inaccurate audience measurement data. In particular, NMR's flawed measurement data inhibits cable operators (MSOs) from developing and selling advertising for so-called non-linear programming, such as on-demand television programming. NMR's inaccurate and misleading reporting also leads to the

increased likelihood that smaller cable networks and networks in development, such as ReacTV, will fail because NMR cannot accurately measure the viewership of smaller networks that rely on advertising revenues to survive. Indeed, MSOs carrying programming from the smaller networks have had difficulty selling advertising for their programs because the small sample sizes utilized by NMR do not capture the viewership of those channels. NMR's methods do not adequately or accurately measure advertising exposure, which is central to ad-supported television. As new channels have proliferated, networks and advertisers have suspected that NMR's antiquated, diary-based, small sample approach results in inaccurate reporting of viewership for the national broadcast networks and an underreporting of viewership for the cable channels, lower-rated network broadcast programs, and other new programming. NMR has not undertaken any real innovation to cure this discriminatory impact of its ratings in the hope of maintaining the business of its vital, favored customers whose ratings data are skewed and from whom NMR exacts the largest monopoly rents. On information and belief, NMR varies the pace of innovation that allows its favored customers to dampen the effect that more accurate ratings would have, adversely affecting the value and price of ratings received by other customers. By dampening the rate at which

more accurate rating techniques are rolled out from market to market, NMR protects and further entrenches its monopoly.

***erinMedia's and React TV's Businesses***

21. Like NMR, Plaintiff erinMedia is a media research company engaged in the production and sale of market research and television audience research, analyses, ratings, and reports through the examination of television audience behavior. Unlike NMR's inferior methodology, erinMedia has developed advanced database technologies and business processes (patent application pending) that allow it to analyze second-by-second television viewing statistics through the use of privacy compliant tuning data collected from advanced set-top boxes and independently gathered demographic data. erinMedia's advanced collection technology and methods enable it to produce highly accurate measures and analyses of audience behavior, size, and demographic composition. This technology provides networks and advertisers with an unprecedented understanding of how national and local audiences view television and how the audiences break down by demographic group, including providing detailed viewing characteristics of the television audience, information on audience flow and viewer sharing, and data on second-by-second viewership levels. As a result, erinMedia's products enable media

buyers to pin-point key demographic trends and vehicles that heretofore have been undetectable.

22. erinMedia's process allows it to directly access data concerning potentially millions of television viewers as compared to the extremely small and unreliable sample number of households NMR uses to collect data for its analysis which, upon information and belief, total only approximately 8,000 households in the national sample. erinMedia's census-like, privacy compliant, second-by-second collection methodology provides meaningful, granular behavioral analyses to the benefit of the networks, advertisers, and consumers.

23. In the erinMedia model, MSOs deploy set-top boxes into the market, utilize and pay another party to harvest and scrub the data to eliminate privacy issues, and then a third party, such as erinMedia, uses privacy-compliant technology to derive and sell accurate ratings and behavioral analysis. In the erinMedia model, these three parties separately ensure the integrity of the data collected and provide natural protections against any incentive to manipulate the samples, the data collected, or the ultimate analysis. Under the erinMedia model, three service providers share in the process and fee structure, instead of one entity dictating all aspects of the compilation and analysis process.

24. Plaintiff ReacTV is a television production company dedicated to the production and development of reactive television programming, including the development of an interactive gaming network that, when launched, will allow television viewers to compete for prizes by watching and reacting, through personal responses, to television programming and advertising. The reactive gaming program will require viewers to make their selections and enter their responses via the Internet, cell phones, cable set-top boxes, or specially-designed remote control devices. ReacTV will operate by charging a fee to advertisers to air the ads on which the advertisers receive viewer feedback. The rates charged to advertisers will be based on the number of people viewing any given ad, and thus, ReacTV requires precise audience measurement on an ad-by-ad basis. In addition, the amount of the available prize pool is directly tied to the number of viewers watching the advertisements, and the more viewers who watch the ads, the larger the prize pool. It is critical to ReacTV's business model to have access to detailed, accurate, television viewership information.

## ***NMR Has A Monopoly In The Relevant Market***

25. NMR has a monopoly in the relevant market, giving NMR the power to control price and output. This fact is well known in the television industry. For example, a recent "*Independent Task Force on Television*

*Measurement Report*," dated March 21, 2005, and featured on an NMR website (www.everyonecounts.tv), matter-of-factly states on page 10 of the Report that NMR "is the only real source for vital television viewer data . . . ." Other publications featured on the same NMR website also report industry observations that NMR is a monopolist. In a November 8, 2004 U.S. News & World Report, in an article entitled "*The tracker behind the tube*," one "top network executive" is quoted as saying "The industry absolutely loves to hate Nielsen for being a monopoly . . . ." In the same article, David Poltrack, head of research for CBS, is quoted as saying of NMR that "Only a monopolist could publicly challenge the integrity of its clients and get away with it." Similarly, BusinessWeek cites in a September 20, 2004 article entitled "How Nielsen Stood Up to Murdoch," "incontrovertible evidence that [NMR's] lucrative monopoly is intact."

***NMR's Unlawful Maintenance of its Monopoly and its Anticompetitive Effect***

26. NMR has undertaken predatory acts designed to impede and prevent the successful entry of competitors, such as erinMedia, that will erode NMR's monopoly position by selling better, more innovative products at lower prices in the relevant market. NMR has consistently undertaken these predatory acts because it has inferior audience measurement data that would not prevail in

a competitive market, at least not for all segments in the relevant market (in particular digital and analog cable). Approximately 60% of the American television audience receives television programming via cable. Digital cable homes generate set-top box data that erinMedia would be able to use to generate highly accurate, second-by-second, program-by-program ratings based on millions of households, as opposed to the mere thousands relied upon by NMR. The NMR monopoly effectively precludes the four national broadcast companies from devoting substantial dollars (perhaps 60% of the hundreds of millions currently being spent each year on NMR ratings) to seeking ratings based on methodologies like those developed by erinMedia or other potential ratings competitors. NMR's monopoly results in all national ratings dollars being tied up with NMR. Fair and open competition would allow differing competitors to compete for revenue for audience measurement data and provide the most accurate ratings for each delivery venue (*e.g.*, cable service, over-the-air, etc.).

27. NMR has continued, as it did before the FTC's 1963 Order, to attempt to sustain its monopoly position through the acquisition of its competitors. NMR has a history of responding to competition by acquiring or entering other business arrangements with competitors. Indeed, immediately

prior to the filing of this lawsuit, NMR made transactional overtures to erinMedia. erinMedia declined to engage in serious discussions with NMR about a transaction and concluded that the only way to enable erinMedia to compete was to file this action challenging the NMR monopoly.

28. NMR also has acted to maintain its monopoly by securing, from time to time, multi-year, staggered contracts with some or all of the four national broadcast networks, ABC, CBS, Fox Broadcasting, and NBC. These contracts are for terms of approximately four to seven years, and generally terminate at significantly different times. Upon information and belief, NMR imposes steep financial penalties on customers who refuse to enter into long-term agreements. By strategically staggering the termination dates of these contracts, NMR has acted to entrench its monopoly by making it essentially impossible for erinMedia, or any other competitor, to challenge NMR as the currency for national television ratings in the industry generally or in any segment of the industry.

29. NMR's predatory practices, including, without limitation, those described above, have foreclosed competitors, such as erinMedia, from the relevant market, thereby stifling innovation and supporting anticompetitive prices.

30. Despite erinMedia's superior product, erinMedia has been stymied in its attempts to compete in the relevant market by NMR's anticompetitive conduct. Cable MSOs have been reluctant to agree to provide their set-top box data and develop national contracts with erinMedia because erinMedia is effectively precluded from gaining contracts with broadcast networks to measure their program viewership over cable, and cable MSOs fear that erinMedia cannot currently compete with NMR due to NMR's entrenched monopoly. On information and belief, cable MSOs also fear that NMR will disparage any effort by cable MSOs to provide set-top box data to a competitor like erinMedia, and will raise unfair concerns about whether cable subscribers' privacy can be protected if set-top box data is shared to generate ratings. NMR's monopolistic practices have thus caused an inferior and more expensive product to remain entrenched in the relevant market, preventing open and fair competition by providers of less expensive and better quality products, including the products of Plaintiff erinMedia.

31. In addition, as a result of NMR's antiquated and imprecise data collection methods and the inability of competitors, such as erinMedia, to sell their products in the marketplace, ReacTV has been unable to purchase the information it needs because the information on which it depends -- precise,

second-by-second television audience measurement -- is not currently available through NMR, and NMR has effectively prevented erinMedia and other potential providers of this information from selling their product in the market. ReacTV has partnered with erinMedia to provide the audience measurement service and analysis needed to establish the advertising rates and prize pool amounts for the development of ReacTV. However, because erinMedia has been unable to access this critical data as a result of NMR's foreclosure of its competitors and because NMR does not provide the information needed for ReacTV's business, ReacTV has been unable to develop its interactive gaming network.

**FIRST CAUSE OF ACTION**

***(Violation of Section 2 of the Sherman Act, Monopolization)***

32. Plaintiffs reallege and incorporate by reference herein each and every allegation contained in paragraphs 1 through 31.

33. NMR has monopoly power in the Relevant Market.

34. On account of the intentional predatory conduct described herein, NMR artificially has maintained its monopoly in the Relevant Market and thus prevented open and fair competition from erinMedia and other actual or potential competition.

35. NMR's conduct has had and/or is likely to have the following effects, among others:

(a) actual and potential competition in the Relevant Market has been injured, limited, reduced, restrained, suppressed and effectively foreclosed;

(b) consumers in the Relevant Market have paid or are likely to pay anticompetitive prices, and have received or are likely to receive lower quality product/service;

(c) actual or potential customers in the Relevant Market have been denied better products and services; and

(d) actual and potential competitors of NMR, including but not limited to erinMedia, have been effectively foreclosed from competing on the merits with NMR in the Relevant Market and have been injured in their business and property.

36. NMR's actions achieve no legitimate competitive benefit to counterbalance the anticompetitive effects of NMR's predatory conduct.

37. As a proximate and consequent cause of NMR's violation of Section 2 of the Sherman Act, erinMedia has been injured in its business and property in that (a) erinMedia has lost sales, profits, and access to customers; and (b) erinMedia has suffered other injuries to its business.

38. As a proximate and consequent cause of NMR's violation of Section 2 of the Sherman Act, ReacTV has been injured in its business and property in that (a) it has been unable to obtain access to needed products and services to sell its services; and (b) it has suffered other injuries to its business.

39. In addition to the injuries set forth above, NMR's conduct has caused additional injury to competition, consumers, erinMedia, and ReacTV that cannot be compensated solely by monetary damages. Accordingly, injunctive relief also is necessary to prevent irreparable harm caused by NMR's predatory and unlawful conduct.

**SECOND CAUSE OF ACTION**

***(Violation of Section 542.19 of the Florida Antitrust Act)***

40. Plaintiffs reallege and incorporate by reference herein each and every allegation contained in paragraphs 1 through 39.

41. As a proximate and consequent cause of NMR's violation of Section 542.19 of the Florida Antitrust Act, erinMedia has been injured in its business and property in that (a) erinMedia has lost sales, profits, and access to customers; and (b) erinMedia has suffered other injuries to its business.

42. As a proximate and consequent cause of NMR's violation of Section 542.19 of the Florida Antitrust Act, ReacTV has been injured in its

business and property in that (a) it has been unable to obtain access to needed products and services to sell its services; and (b) it has suffered other injuries to its business.

43. In addition to the injuries set forth above, NMR's conduct has caused additional injury to competition, consumers, erinMedia, and ReacTV that cannot be compensated solely by monetary damages. Accordingly, injunctive relief also is necessary to prevent irreparable harm caused by NMR's predatory and unlawful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

(a) that the Court grants Plaintiffs judgment in their favor on all counts;

(b) that the Court award treble the damages sustained by Plaintiffs on the First and Second Causes of Action, in an amount to be proved at trial;

(c) that the Court award Plaintiffs appropriate injunctive or other equitable relief to prevent NMR from continuing to unlawfully monopolize the Relevant Market, including without limitation an order requiring the immediate termination of any multi-year, staggered contracts in effect with ABC, CBS,

Fox, or NBC to allow full and fair competition for the business of those customers;

(d) that the court award Plaintiffs interest, including prejudgment interest, attorneys' fees and costs of suit; and

(e) that this Court grant Plaintiffs such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues properly triable thereby.

Dated: June 16, 2005

C. Philip Campbell, Jr., Esquire
Florida Bar No. 160973
Trial Counsel
Tammy N. Giroux, Esquire
Florida Bar No. 0999938
SHUMAKER, LOOP & KENDRICK, LLP
Bank of America Building
Suite 2800
101 East Kennedy Blvd
Tampa, Florida 33602
(813) 229-7600 (telephone)
(813) 229-1660 (fax)

and

Richard A. Schneider
Jeffrey S. Cashdan
Jennifer R. Vala
KING & SPALDING LLP
191 Peachtree Street, N.E.
Atlanta, Georgia 30303-1763
(404) 572-4600 (telephone)
(404) 572-5100 (fax)

COUNSEL FOR PLAINTIFFS